We have one case that remains that are sitting for today, and that is NJEnvironmental Federation et al. v. United States Nuclear Regulatory Commission number 09-2567. Mr. Webster, Mr. Rader, and Mr. Fagg. Good afternoon. I'm Richard Webster, appearing on behalf of petitioners. Make sure you keep your voice up if you would, please. Okay. That's being recorded. Absolutely. First of all, I'd like to reserve four minutes for rebuttal time. That's fine. Thank you very much, judges. It's a pleasure to be here in Philadelphia this afternoon. This is a case about the Nuclear Regulatory Commission doing its utmost to avoid a hearing on issues related to nuclear power plant safety. Nuclear power plant in this case is Oyster Creek. It's the nation's oldest nuclear power plant. It's located around 50 miles west of here on the Jersey Shore. Now, hearings in these cases are not typical, are they? Not at all. In fact, the hearing that was held in this case was one of the few that's been held in any of the relicensing cases across the country. That's correct. In fact, this was the first one. Okay. Hearings are typical for new licensing. Right. But they're atypical for relicensing.  In part because the agency has made it much more difficult to obtain a hearing. What initially put this particular nuclear plant on the radar screen? The fact that it was the oldest operating, I guess it started in 64. Is that correct? I think it started in 69. 69. Okay. I thought it was 64. But is this the oldest? It is the oldest operating plant. Yes. So I think initially what had happened was the containment system, which is the component that Chernobyl lacked that Three Mile Island had and mitigated the Three Mile Island accident considerably, had corroded dramatically during the time that the plant had been operating. It started off just over an inch thick and ended up in spots just over half an inch thick. And there were letters from the agency to the reactor owner saying, you have to monitor this component very carefully. You have to monitor it. Where is this plant located in relation to the shore? This is just south of Tom's River in Lacey Township. How far is it away from the shore? It's directly upon the shore. It draws its cooling water from Barnegat Bay. Is the fact that it's so proximate to the ocean, is there a greater likelihood of contamination? Well, certainly there were chlorides found in that area where the containment system was corroding. It's not clear exactly where they came from, but it's likely that some of them came from the sea air, absolutely. So this system had been corroding. There were letters on the record saying that it should be monitored for the life of the plant. But as a result of some measurements taken in 1992, the licensee had discontinued those measurements and was proposing no more measurements whatsoever during the extended 20-year period that was going to be obtained if the license were granted. Therefore, one of my clients actually initially intervened in this process, submitted a petition basically saying, on the record, how can you be saying that it needs monitoring for the life of the plant, but then not allowing any monitoring? It subsequently became evident, actually, that the monitoring upon which they had based their decision to discontinue was incorrect. And the monitoring showed the containment system getting thicker, which, of course, is physically impossible. Nonetheless, the applicant and the NRC chose to believe that monitoring and discontinue all monitoring on that basis. So initially the contention came about because it was pretty clear that general principles are that as you get closer to a margin, you monitor more, not monitor less. And it was pretty clear that that general principle was not being adhered to here. So if I can get back to the procedural issues, the deficiencies here. I mean, the normal, I guess, blink response is that after what happened to us at Three Mile Island in 79, there would be even more vigilance than there existed there before because no one wants that blot on their escutcheon. You're basically saying that that blink response isn't necessarily the case. Absolutely. I mean, there's been a number of incidents since the Three Mile Island showing you that that response would be good if it were true, but unfortunately isn't always true. There's been the Davis-Bessey incident where the reactor head corroded to within quarter of an inch of failure. There's been a Vermont Yankee incident where a cooling tower collapsed due to lack of aging management. There's been incident at Oyster Creek where the tritium has leaked out from pipes because the pipes have developed holes in them and the licensee didn't detect the degradation before the holes developed. So there's lots of evidence that if not watched very carefully, these aging issues do come and have detrimental effects. And really what the AEA provides for is not only should the agency be vigilant and make a very careful and definitive finding of safety. That's what I call the belt in this process. There also should be some braces or, as I know here, suspenders, which kind of destroys the alliteration, which is the hearing right that citizens have the chance to get a hearing and make sure that the applicant really is doing a good job at managing aging over time. Mr. Webster, you have a heavy burden in this case. Our standard of review is abuse of discretion. I think it's unlawful. I think if we can show unlawful conduct or we can show arbitrary and capricious decision-making, that also can apply. So I think the burden is one of those three standards, depending exactly upon the violation. We're alleging a number of procedural violations, which I think we're alleging actually is unlawful conduct. So I'm not sure our burden is as high as it might be. Procedural violations enough to establish unlawful conduct under an abuse of discretion standard. Okay. That would be my question as I look at this case. First of all, I commend you for I think both sides have done an excellent job in their briefing on a very complex issue. We don't see many cases like this before our court. But in looking at the briefs and trying to evaluate the record, I'm just struggling with how we call this an abuse of discretion from our view of what the NRC did. Let me pick that up. I mean, the statute grants citizens a hearing right. It says that you inherit a right, the case law. Let me just add on to that. Okay. You want to focus principally on ultrasonic testing or the monitoring of the corrosion or the metal fatigue or what? Let's pick one. Well, let me focus initially on the monitoring of the UT, the UT monitoring of the dry well. And the statute grants a hearing right. We asked for a hearing. Initially, we asked for a hearing based upon complete lack of measurements. There were no measurements, so we said the lack of measurements is a problem. After we made that contention, after it was admitted, the licensee then decided to provide some minimal amount of monitoring. It then moved to moot us out, and, indeed, the licensing board said, well, since the initial contention was about lack of monitoring, and now you have some monitoring, you're moot, but you can now contend, you now have the ability to put in a contention about the adequacy of the monitoring. We did that, and among other things, we contended about the frequency of monitoring, how often it would be done, and also about the spatial scope of the monitoring, how much area would be monitored. In the end, the frequency initially proposed was once every 10 years. That increased over time as the applicant improved its proposal during the proceeding and ended up being once every four years with some additional provisions for more frequent monitoring if certain events occurred. The spatial scope, in contrast, started off at around less than half a percent of the area under question being monitored. And although some spot monitoring was added later, the actual aerial monitoring was never changed. And so the agency denied us that contention on spatial scope, even though it granted the contention on frequency. And fundamentally, there was no difference in the timing between the two. The only reason it was denied was timing. But there was no reason, there was no difference in the timing. Initially, the board said we should have contended when Exelon agreed to take some additional measurements before the period of extended operation. Thereafter, the board said, actually, you're not allowed to contend about. Well, how do you overcome their finding that your request was untimely? Well, we could not have. Subsequently, the board said we could not make a request about monitoring that did not occur during the extended period. So it's clear that we could not have monitored. We could not have made the request in December 2005. And indeed, the commission found that in its decision. The commission said, had we made that contention on spatial scope in 2005. But wasn't the fact that they said they would perform measurements in the same locations tested in 1990 adequate notice to you as to what monitoring they proposed? No, because they didn't propose. Isn't that what the NRC found? Ultimately, the NRC found that the NRC did not, the commission did not tell us when was the right time to make the contention. They said that after December was the wrong time. They implied that the right time was at the start. But there was no monitoring proposed at the start. We could not have contended that the spatial scope was inadequate at the start. There simply was no monitoring. Are you saying they didn't propose to monitor the same as they did in 1990? No. I'm saying that the monitoring, although when they proposed the monitoring, it was the same as 1990, they didn't propose to do any monitoring at all until April of 2006. So we could not have been clairvoyant and known that they were going to propose the same location. The original application said we'll do the same thing as we agreed to do in 1990. No, the original application didn't propose any monitoring at all, and indeed our contention was precisely about the complete lack of monitoring. Well, wasn't it understood that the monitoring would continue that was agreed to in 1990? No, it wasn't. It was understood that there would be no monitoring. The point, if in April of 2006 they said they'll do additional monitoring, and basically it's using the same criteria that they used before, and you're now saying that that's inadequate, why didn't you say it was inadequate prior to April of 2006? Because the monitoring only started in 92. Oh, no, the monitoring started in 82, I think. There was no licensing process at that time. So this was the first time we got to have a detailed look, actually, at what was going on in terms of this monitoring, and the first time where we formally had the ability to avail ourselves of this. Are you saying you didn't know that the monitoring was going on? No, no, the monitoring wasn't going on. The monitoring was finished in 96. The monitoring was finished in 96. There was no proposal to do any more monitoring. The monitoring was not going on. We knew there was no monitoring. We contended that there was no monitoring, and the board granted that contention because that was correct. So there was no time at which we could have got that hearing, and that violates our hearing right. The Union of Concerned Scientists case clearly states that to meet the statutory requirements, the agency has to offer us, cannot exclude material issues completely from the hearing process. The spatial scope issue is clearly a material issue, and we were clearly excluded completely. And so that was a statutory violation. That was unlawful, and that's why on that issue, this court needs to remind it back to the agency for a hearing. Let me pick up another. Could you turn for a second to the embedded region? Okay, right, the embedded region. Similar sort of set of factual circumstances. No monitoring was proposed. Some issues came out whether embedded region corrosion could be a problem. The licensee extended, actually, an interior trench a little bit to take some additional measurements, take the first measurements ever in the embedded region. We then contended that the proposal for future monitoring of the embedded region was inadequate, and once again, for reasons that actually remain obscure to me, the licensee board found that untimely. Now, wasn't there a staff report back in November of, like, 2005 that mentioned that there could possibly be a problem with potential corrosion in inaccessible areas? Right, well, inaccessible areas, there's two different types of inaccessible area. One is the area where there's concrete on one side, there's concrete on the inside, but no concrete on the outside. And the other is the area where there's concrete on both sides. The embedded region is actually the region where there's concrete on both sides. The inaccessible area is the one where there's concrete on one side. The report, the staff report, indeed, is acted as the trigger for Exelon to then enhance their monitoring, and ultimately acted as the trigger for us to make contentions about that. I mean, in other words, that was the spur by which Exelon ultimately discovered that there was water in October of 2006? Absolutely. Well, actually, they should have known before, but they didn't pick it up. So they found the water. When they went and dug the trench, they found the water in it. And that's how they found the water on the inside. And water on the inside, just to be clear, water on the inside triggers the danger of corrosion on the inside. In the absence of water, one wouldn't expect corrosion to occur. And the danger is that you get corrosion coming from both sides. And, indeed, that's been a problem in other reactors where even where iron is in concrete, in contact with concrete, if there are impurities in the concrete, then the iron can corrode from the inside. So here we do have a situation where the iron can corrode from both the inside and the outside. Once again, our expert didn't think they were dealing with that issue properly. That raised the material dispute. What was your argument as to what should be done? Our argument is basically that there should be a full scope scan of the thickness of the dry well. And that hasn't been done yet? Won't be done at all. The proposal is one that's less than .5 percent. We think 100 percent is appropriate, but it may be that if one did some fancy statistics, one could get down below 100 percent. But there's always a danger of small areas corroding from the inside in a way that's undetected. That's happened at other reactors. It happened, actually, at five other reactors in the recent history. And so we absolutely think that's a problem. And it needs to be addressed here. Now, if I can just turn quickly, because I'm running out of time here, to my mental fatigue contention. The key thing here is that the agency applied the reopening standard, even though this is an issue that we've never had the chance to raise before. But the staff has completed its review of Exelon's application of the so-called Green's function. Right. The staff did complete their review of it. Our expert, who was the one who originally found the problem, the staff missed this problem at seven reactors. Our expert found it at the Vermont Yankee reactor. That led the staff to notify us that they thought there may be a problem with the calculations at Oyster Creek. The very same expert did not agree on the basis of the limited amount of information that we had available that this analysis was adequate. There's an issue about the assumptions, whether the cladding should be neglected or not. There, the NRC basically just adjudicated the issue. They said, no, neglecting the cladding is not a problem. Our experts said it was. Their experts said it wasn't. That raised a material dispute. Prematurely adjudicating that dispute at the contention and mission stage was wholly inappropriate. Applying the reopening standard, likewise, is a violation of law. Because, once again, in the UCS case, for example, and in a couple of other DC circuit cases, the DC circuit has found that one cannot use the reopening standard where it's a wholly new issue because that serves to exclude citizens completely from hearing on that wholly new issue due to the very limited amount of discovery available. Anything further? I've got four minutes. I guess I'll come back. Okay. Thank you very much. Thank you. Mr. Rader. May it please the Court, my name is Robert Rader, and I represent the Nuclear Regulatory Commission. First, I wanted to respond to the Court's concerns about nuclear safety in general. I want to make very clear on behalf of the Commission that following the TMI accident, we, as well as the industry, made strenuous efforts to upgrade our regulation, our regulatory strength, and our regulatory programs. There have been industry groups developed as a result of the TMI accident, and we've continued to work with these groups and with industry to assure that no further accidents occur. As a result, we have what I think is one of the finest safety records in American industry. Basically, generally what I hear them saying is that they're coming out, they're pointing out possible weaknesses, at least things that they perceive that need more study. And instead of, in effect, working with them, what you're doing is you're saying, well, they're out of time, and that's not the way the system should be working. It's important to understand, Your Honor, that with respect to nuclear power reactor licensing, there are two distinct aspects. One aspect involves the staff review of the application to make sure that the applicant licensee has satisfied all of our requirements for safety. And that process goes on regardless of any adjudication or even a request for adjudication. As the Court pointed out, in some cases we don't even have a request for hearing. But our strenuous staff review, supervised by the Commission, nonetheless assures plant safety. We don't rely upon hearings to produce safe reactor licensing. However, we use it as an adjunct, and when we do give an opportunity for hearing, we expect potential litigants to come to us armed with facts, armed with expertise, and to present timely contentions. Let's just take, for example, the dry well. They talk about, okay, there was potential to have water. You later discover that, in fact, there is standing water. Doesn't that basically warrant the submission of that contention? I think Your Honor is referring to the two contentions relating to the embedded portion of the dry well, which came up in December of 2006. Essentially what the Board found was that water was discovered in October of 2006. I'm saying the contention itself was filed in December of 2006. However, Your Honor, the point that the Board explained, which the Commission accepted in terms of the timeliness of the contention, is that the discovery of water as such did not add any new knowledge to this issue. In fact, the trenches had been dug where the water had collected for the purpose of UT monitoring. In other words, it was understood that water could infiltrate because of the reactor operation or could infiltrate from groundwater sources, and therefore could collect on the inside embedded portion of the reactor lining, dry well lining, and therefore UT monitoring would be required. The trenches were dug to accommodate the UT monitoring that was done. So the actual discovery of water in those trenches subsequently did not really add anything new to our body of knowledge regarding the potential for water infiltration and therefore the potential for corrosion. But in effect, would the trenches for UT monitoring have been done were it not for their contentions pertaining to the not having enough testing or adequate testing for that? Your Honor, the trenches were long in existence. They long preceded the application for a renewed license. They were dug, as I recall, many years ago, perhaps back in the 1990s. There was a program in place, as the Board points out, throughout its decision. I would refer the Court to the discussion of the previous programs at the beginning of page 270 of the appendix and going on several pages after that and also later in the initial decision of the Board. There is discussion of the program that was in place, and there is a very good explanation generally speaking of the monitoring program that was in place and which laid the basis for the Commission's findings. Were the trenches dug before the 1996 testing or UT testing or what? I don't know exactly when the trenches were dug, but that information is clearly within the licensing board's decision regarding this particular contention and why it was not deemed timely. I'm confident that the trenches were in place well in advance of the filing of the application and well in advance of the time that the petitioners were called upon to file timely contentions. When would it have been timely? It would have been timely, Your Honor, when the original contention, which was accepted, was filed. The point of the Board was that all of the information regarding the previous program was in place, was in the record, and was available to the petitioners. All of that information could and should have been drawn upon by the petitioners for them to formulate whatever contentions they had regarding any deficiencies in the monitoring program or even the absence of a program. Our regulations are clear that petitioners have the opportunity to challenge not only deficiencies in a program, but also the absence of any program whatsoever. The applicable provision, which the Board cites repeatedly throughout the discussion of these issues, in addition to the timeliness issue, is Section 2.309F1, Romans 6, and it says that in a proceeding such as this, the obligation lies upon the intervener challenging the application to provide sufficient information to show that a genuine dispute exists with the applicant licensee on a material issue of law or fact. And it goes on to say that in addition to that, if the petitioner disputes the application, he may also submit contentions if he believes the application fails to contain information on a relevant matter. And in such case, he must identify the failure and the supporting reasons. In other words, if the petitioners believed that the monitoring program which they proposed in their contention, which was admitted and was fully litigated, required various aspects which were not added until their contention was revised six or seven months later, they should have included those aspects originally in their contention. That was the point of the licensing board and the point of the commission upon affirmation. And none of what you read there talks about timeliness. Yes, Your Honor. My point there is that the regulation anticipates that a party can challenge the absence of a program. In other words, if a program has elements A, B, and C, the petitioner can say it also requires D, E, and F. But suppose there's no program with A, B, and C. The petitioner still has the right to come in and say, as they did in this case, you don't have any program. We did have the licensee did have a program for visual monitoring. But Mr. Webster is correct that the contention proposed the continuing of the UT monitoring into the renewal period. And that contention was accepted. It was litigated at great length. And I would ask the court to take care to review the merits and the disposition of the merits on that contention because it demonstrates that the NRC is concerned about safety. We gave extraordinary, meticulous care to the development of the record and the decision on the contention that was admitted. And as a result, I feel that the plan's safety was improved. So for that ‑‑ What harm would there have been to have given a hearing on this contention? Well, there's never harm in the particular sense of damage to the plan's safety. That's true. I mean, the plan is not going to be made less safe. But the courts have recognized that technical agencies like the NRC have limited resources. And because we have limited resources to devote to hearings, not only our judges but also our technical staff, we require that contentions be timely so as not to delay the proceeding and as to allow us to reach a timely decision as requested by the licensee. It appears that through the relicensing process that clearly hearings have been the exception rather than the rule. There aren't that many renewal applications, Your Honor. We have over 100 operating reactors. And many of those will not seek renewal or the renewal has not yet come into term. I think there are about 15 in the works. I don't know how many of those will result in hearings. But we're talking about a relatively small universe of reactors that have actually gone into renewal proceedings. So it's not really filled. Those statistics would somewhat argue the point of the petitioners that if you have a small universe, even though no staff is unlimited, what harm would there be to provide a hearing, particularly when a significant issue? Well, our staff is not divided into the units that deal with renewal issues and operating reactors. I understand that. But you don't have a lot of new reactors coming online either. That's also true, Your Honor. But I can assure you if you were to look at our budget request, you would see that our staff is actually quite busy. I have no doubt about that. But the point is, Your Honor, the courts have upheld our timeliness rules. This court has upheld our reopening standard in the TMI case. The courts have said that we have discretion to have these rules. Therefore, if we have discretion under the APA and the Atomic Energy Act to have a rule which requires a timely submission, the only question for the court to decide is whether or not there was an abuse of discretion in its administration. Well, they say on the reopening rules that this really wasn't a reopening question and the application of that rule was, in fact, in error. They do say that, Your Honor, and that requires a manipulation of the Union of Concerned Scientists case, which is actually wrong. What the petitioners are arguing is that the Union of Concerned Scientists case, and cases like it, which held that the NRC could not exclude from licensing hearings issues material to license, such as the results of emergency planning exercises, somehow requires in a licensing case that the commission consider any issue that was not previously adjudicated in that proceeding. That standard would absolutely raise havoc with our proceedings because it would actually create greater rights than initially existed at the beginning of the proceeding. We cannot have a reopening standard that allows any new issue to come into the hearing just because it wasn't previously litigated in that same proceeding. Our rules specifically apply the same rule as to new information on contentions that were litigated as well as new contentions that were never litigated. We apply the same standards, again, standards which were upheld by this Court in the TMI case. The other argument which counsel has made in his brief, again, is this prematurity argument, what he calls the white queen fallacy. And, again, I'd just like to point out, as the Board did, there was an opportunity for the petitioners to submit all of their contentions based upon the record, which I've cited again today and which I would invite the Court to review, not only with regard to the proceeding in general but also with regard to the particular handling of these contentions because the Board and the Commission took meticulous care to point out the particular points of the record which demonstrated that publicly available information could have been relied upon by the petitioners to frame their contentions in a timely manner. The fact remains that the plaintiffs did submit a timely contention, and it was accepted, and it was fully litigated. That's the proof of the pudding in the taste. On the mental fatigue issue, they point out that the information about the non-conservative application of the Greens function was brought to your attention by an intervener in a licensing proceeding. I have no way to validate that, Your Honor. The claim was that one of their experts raised an issue which became an issue in the Vermont Yankee case. I haven't verified that. I don't know whether it's true or not true. I accept counsel at his word. But the point is the staff sent a generic information notice to each of our reactor operators and said, this has been identified as a potential issue. We want you to go back and requalify your use of the Green function in terms of your calculation of cumulative usage factor. That was done in this case. The only issue was whether or not the issue was safety significant sufficient, in this case, to require reopening. The information submitted by the petitioner on this point to the NRC did not demonstrate a safety significance under the standard that we apply in reopening. Again, a standard that was approved by this Court in TMI. The Board relied upon a staff affidavit, in part, which this Court approved in TMI. Part of what they're saying is, look, we bring to your attention somebody, something that someone else found, which should send up a red flag, and yet what you're doing is shutting us out of the process. Why not let them, back to Judge Fischer's question, what's the harm with having them involved so that maybe they go further than you would, but as we all agree, we can't afford to have a mistake here. Well, that's the entire point of the findings of the Board, that there is no mistake, quote-unquote. The fact is that the information provided, there's a difference between the safety significance of this calculation as to apply to a particular plant and the way it was performed and the issue in general. Now, I don't know who brought the attention to the attention of the Commission, the issue in general, but I do know that the Commission did respond. It responded generically to all reactor licensees and it asked in particular for the licensee, in this case, to provide information which was reviewed in the record. You can see in the Court's, I'm sorry, in the Board's analysis of this late contention that was offered for reopening, a meticulous analysis of the technical merits to develop whether or not a safety significant issue arose. That was the standard that was applied. The correct standard was applied. The only question for the Court is whether or not there was an abuse of discretion in applying that standard to the technical facts which came before the Commission as a result of the licensee's response. And on that point, the answer is clear. Given the technical, engineering, and scientific knowledge of the Nuclear Regulatory Commission, this Court has repeatedly said that deferences owed us on these kinds of factual questions. Would there have been a harm? Of course, there's never a harm in having a hearing, again, as I say, except to delay the process and to use scarce agency resources that should be used elsewhere for more important issues. Thank you very much. Thank you, Mr. Fagg. May it please the Court, thank you. I'd like to pick up with that last point. What's the harm? Just note your name for the record. I'm sorry, Brad Fagg for Intervenor Exelon. Apologies. To pick up with that last point, what's the harm of having a hearing? We live in a litigious society. I would suggest that the default ought not to be adversarial litigation. There are all sorts of reasons why, and that's why there's case after case after case that has upheld this agency's discretion about constraints upon adversarial litigation. So the notion that there's no harm to having a hearing and the default ought to be adversarial litigation, I would suggest, is not one supported by the proper role of this agency and, again, the case after case after case that occurs in it. How best should groups like the various citizens groups here be heard, then? This group was heard. This group was every effort was made to bend over backwards to give this group every opportunity to be heard. This group is now challenging the lack of opportunity to be heard on other and different matters that were not raised, in many cases, in a timely manner and or, and this is significant, and or were rejected substantively because the contentions themselves did not satisfy the rules. So to be heard, you comply with the rules, like any... But if, let's just say theoretically, I'm not saying that's necessarily the case with Oyster Creek, but let's say they're out of time, but they discover a significant problem with regard to a particular plant. And obviously the answer can't be that they're out of time. You've got to deal with it because none of us, for purposes of our, I guess, national energy policy, for purposes of just the whole idea of atomic energy in this country, you can't afford to have another TMI. No one would argue. Of course you cannot afford to have another TMI, but it's important to understand the regulatory scheme here. Untimely contentions can and are heard. There's a very specific regulatory scheme that allows the agency to evaluate upon a showing of good cause, upon a balancing test of factors. Untimely contentions, such as Your Honor proposed, in the abstract can be heard. They, getting back to this case and the record in this case, there were not sufficient contentions out of time that met the standards, again, that have been upheld in case after case after case that govern whether the litigation has to end at some point. And so, again, going back to the untimeliness contentions, and I'd like to turn to a couple that we... So, Mr. Fagg, your argument then would be that, you know, we review this on an abuse of discretion standard. Your argument would be that the decision made by the NRC as to whether or not to grant the hearing under time was proper within their jurisdiction. Although people could argue about it as citizens has, it certainly wouldn't be at abuse of discretion. That is correct. Union of Concerned Scientists, too, that we've cited, and both parties have cited in the briefs of the D.C. Circuit, makes that clear. Timing decisions and determinations because of this very technical agency, this very specialized agency to which virtually unique deference is owed are part and parcel of the deference that is owed to this agency. And so when you look at a contention that's brought six months, a year, two years after the administrative process has started, yes, the agency has the right and, indeed, with all due respect, deference is owed to this technical agency to determine whether the criteria for reopening the litigation, for allowing yet more adversarial activity to occur, is met. And in this case, on an extensive record, and, again, as NRC counsel did, I would also invite the Court to look at the thoroughness with which all of these timing contentions were assessed, both by the Board and by the Commission itself. And so the short answer to your question, Judge Fischer, is yes, deference is owed to those determinations. So with respect to the spatial scope, you know, this is where we place these monitoring devices on the drywall that there's been some discussion about. A couple of aspects to emphasize about that. As of December 2005, there is nothing new that petitioners learned or needed to learn to bring the contention right then. But the six months plus that passed and elapsed, nothing new happened within that. As the colloquies have demonstrated, where those monitors were going to be placed has been known since the 1990s. So if not with the original contention in November of 2005, certainly by December of 2005, when a renewal commitment was made by Exelon, at that point the contention could have been made, but wasn't. Now, to say it could have been timely doesn't mean it would have been successful. And there's been some confusion, I think. When could we have brought the contention? And some questions about that. To say it could have been timely doesn't necessarily mean it would have been successful. And so I think another important fact to emphasize here is at no point on any of these contentions was the petitioner told, you're too early. OK, that is something they've made up to try to justify their late contentions. There was no contention in this case where they were too early. There may have been some, as alternative grounds, were not aging management contentions. They were the current licensing basis. In other words, they weren't challenging the renewal period. They didn't like the way the plant's being operated today. That's a substantive reason to deny a contention, not a timing-based contention. And then one final thing about the spatial scope. We have an interpretation issue. I don't want the impression to be left that somehow the agency put blinders on and no one looked at where the spacing was. As the board pointed out, if you look at page 462 of the appendix, the spatial scope, in some sense, is part and parcel of what was litigated, the timing and intervals. And there's abundant evidence in the record. Their own expert provided testimony that there were arbitrary placements, and there was a lot of litigation about where these monitors were to be placed. So, again, I think it's important that this Court not draw the impression that because what we're now calling the spatial scope contention wasn't admitted, that somehow the agency ignored this, that somehow this wasn't part and parcel of what was assessed. And, again, to go back to something I think it's very important to emphasize, the thoroughness by which this agency assessed and these phone book-sized appendices that we're all lugging around, I think demonstrate the carefulness with which this agency made its determinations before concluding that Oyster Creek could be safely operated for 20 more years. Thank you. Thank you very much. Mr. Webster? Thank you. There's a lot to go out there. I think what's interesting is Mr. Fagg may not think a judicial process is the way to go, but Congress did. Congress granted a hearing right precisely because it thought a hearing would be useful. Mr. Fagg may think that the staff review was extremely exacting, but actually the Office of the Inspector General of the NRC said that the reports about the safety analysis cast doubt as to what exactly the NRC did. Although, after that, did they not change their procedures? I thought... They changed their procedures for future applications, but they did nothing about the ones that had already... For future safety reviews, they did nothing about the ones that had passed. So on that basis, the chairman of the NRC... By the way, is there continuing monitoring by the IG for that to make sure that they have... Not as far as I know. Okay. The chairman emphasized, based on the IG report, that it was unclear from the record whether the staff had actually exercised independent judgment during the safety reviews. The chair concluded it was essential to get supplemental information from the staff to enable the commission to ensure that the staff had actually exercised that independent judgment. He could find no justification or benefit to leaving the record begging those obvious questions. Nor can we. On the issue of timing. Basically, what... I think it became very clear during the NRC's argument that the NRC engrafted a new requirement on their timing rules. They engrafted a requirement that if you don't contend about the lack of a program at the start, you then can't contend about its inadequacy later. That is actually not what the rules say. It is also not what the agency practice has been. After all, if that were the agency practice, it would be very, very difficult for us to get a contention admitted. Because we would have to spot the absence of things that the engineers for Exelon, the reactor operator, who are in possession of all of the operating information, did not spot. That standard, which is not a standard that is actually written in the NRC's regulations, required the interveners to be superheroes. Now here, sitting in the audience here is Mr. Gunter. He was a superhero here. He did spot the absence of something that neither the NRC nor the Exelon's engineers thought was necessary. But that's very rare. To be clear about the number of proceedings, there's one reason why the number of proceedings has been low. There have been 61 re-licensing applications have been submitted. Over 50 have been approved. So far, three have gone to hearing, of which Oyster Creek was the first, and one is scheduled to go for hearing next year. Is part of the concern that you have that not just with respect to individual plants, but are you challenging the parameters in place for safety that you think should exist, but are not in the rules so far? No, we're saying enforce the rules, is what we're really saying. The rules require the agency, the rules require the applicant to prove to the agency that safety exists. What we're saying is that basically what's been happening, as far as we can tell from the record, is that the agency has been basically taking the applicant's word for it, rather than really doing a vigorous and exacting review. And that's not adequate. And there's evidence for that, but really the evidence only comes out when you have a hearing. Because although it would be nice if in the absence of a hearing, I agree to some extent with Exelon, it would be great if we didn't need a hearing. A hearing is a lot of work, believe me.  I routinely ask Exelon for access to information outside of a hearing, and it's been routinely denied. Second of all, actually with the metal fatigue contention, my expert was so concerned that we wrote to the commissioner saying, look, you didn't admit our contention, but we have these concerns, we strongly hope you address them. As far as I know, they got put in the filing drawer. So, you know, it would be great if we could all work together, but unfortunately the industry and the NRC doesn't seem very interested in doing that. And so therefore we're forced to rely on the hearing right that Congress has granted to us, and we ask you to vigorously uphold that hearing right. Thank you very much. I thank all counsel for excellently presented arguments and briefs as well, and we'll take the matter under advisement and adjourn.